BRENNAN, J.[1]
¶1 T.R.C. appeals from an October 17, 2017 order terminating her parental rights to her daughter, D.U.C. (D.), on grounds of continuing need of protection or services. See WIS. STAT. § 48.415(2). At birth, D. weighed just one pound and five ounces. She remained in the hospital for the first fifteen months of her life. She then lived with T.R.C. for ten months. She was removed from T.R.C.'s home at age two based on repeated referrals to child welfare officials and, between that point and the time of the disposition of this case, was continuously in out-of-home placement for forty-six months. She was almost six at the time of the TPR order. T.R.C. seeks reversal of the order on three grounds.
¶2 First, T.R.C. argues that her no contest plea at the grounds phase was not knowing, voluntary, and intelligent because the trial court failed in its mandatory duties in the plea colloquy to explain the different standard of proof that would apply at the dispositional hearing and because she did not in fact understand the consequences of the no-contest plea.[2]
¶3 Second, T.R.C. argues that at the dispositional hearing, trial counsel rendered ineffective assistance in four ways: (1) when the family case manager testified about D.'s episodes of diarrhea after visits with T.R.C., trial counsel failed to object that the family case manager was not a medical expert; (2) trial counsel failed to call as witnesses one of D.'s pediatric specialists and a doctor who had conducted a psychological evaluation that included positive statements about T.R.C.; (3) trial counsel failed to argue that WIS. STAT. § 48.415 was unconstitutional as applied to T.R.C. because her parental rights were terminated in spite of evidence that she was capable of caring for D. and because there were other alternatives to termination; and (4) trial counsel failed to argue that the State had not proved that T.R.C. had "caused [D.] to be sick."
¶4 Third, T.R.C. asks that this court reverse the order in the interest of justice, claiming that subsequent criminal allegations in a separate matter against the guardian ad litem created a conflict of interest that "tainted" the proceedings and claiming that "there are no compelling reasons to terminate" T.R.C.'s parental rights.
¶5 For the reasons below, we conclude that T.R.C. has not satisfied her burden to show that her plea was not entered knowingly, voluntarily, and intelligently. She has not shown that trial counsel performed deficiently. She has not shown that reversal in the interest of justice is warranted. We therefore affirm.
BACKGROUND
¶6 The court report for termination of parental rights prepared in 2016 stated that D., T.R.C.'s fourth child, was born extremely prematurely on November 1, 2011, at 25 weeks' gestation. At birth she weighed only one pound and five ounces.
¶7 The report stated that T.R.C. had been the subject of "at least a dozen referrals" starting in 2010. Prior to D.'s birth in 2011, T.R.C. had three drug-related convictions. During the time D. was hospitalized, T.R.C. could not be found to consent to a needed surgery despite having been told about it months in advance. T.R.C. was "absent for long periods of time" when D. was hospitalized. D. was not released from the hospital to go home with T.R.C. until she was fifteen months old. In October and November 2013, when D. was placed in T.R.C.'s home, officials received reports that T.R.C.'s son, age twelve, had been left alone to care for D. and was afraid to be in the home because T.R.C. was verbally abusive and threatening physical abuse, and because her boyfriend had a gun and drugs in the home. In 2013, T.R.C. was convicted of prostitution. T.R.C. had posted statements on social media accounts that indicated she was selling marijuana and alcohol out of her home in order to pay her bills.
¶8 D. has multiple diagnoses as a result of her premature birth, has had multiple surgeries, and requires frequent doctor appointments. The court report described her as "extremely medically fragile" and as being developmentally delayed. According to the court report, at the age of four, she displayed the developmental characteristics of an eighteen-month-old child.
CHIPS case proceedings.
¶9 On December 17, 2013, after ten months in T.R.C.'s home, D. was taken into protective custody and has continuously remained in out-of-home care. D. was found to be a child in need of protection or services on February 3, 2014, and a CHIPS dispositional order was entered on March 10, 2014, and then extended on December 10, 2015. The written order listed the conditions of return that T.R.C. would need to satisfy. The order also included a warning that T.R.C.'s parental rights to D. could be terminated if she failed to meet these conditions of return. There were three conditions. First, she was required to meet the following goals for behavioral change: (1) manage her emotional and mental health; (2) understand how her substance abuse affects her ability to parent and the well being of her children; (3) refrain from any violence in the home or towards any other person in the home; (4) demonstrate that she understands her children's individual needs and her role as a parent; (5) support the special needs of her children; and (6) resolve any criminal cases by attending hearings and complying with all court orders. Second, she was required to maintain a relationship with her child by regularly participating in successful visitation with the child. And third, she was required to demonstrate an ability to provide a safe level of care for the child.
TPR case proceedings.
¶10 Almost two years after the CHIPS order, on January 6, 2016, the State filed a petition to terminate T.R.C.'s parental rights to D. on grounds of continuing need of protection and services.[3] The petition alleged that T.R.C. had failed to meet the conditions despite reasonable efforts by DMCPS[4] to provide services to enable her to do so. The petition alleged that: (1) T.R.C. had attended only one therapy appointment and had refused medication management services; (2) T.R.C. had been discharged from one AODA treatment provider and had discontinued treatment with another after less than three months; (3) she had not participated in services to address the impact of domestic violence on her children; (4) there were two periods of unsupervised visitation-from fall of 2014 through January 2015 and from May through August 2015-but supervision was reinstated each time due to T.R.C.'s "untreated mental health issues" and "medical concerns" that arose when D. was in T.R.C.'s care; (5) T.R.C. had not "regularly visited" D. during the child's frequent hospitalizations in the months preceding the petition.
¶11 After multiple adjournments the grounds phase hearing occurred on December 19, 2016. T.R.C. entered a plea of no contest to the grounds phase of the proceeding. In exchange for the plea, the State, rather than proceeding to disposition immediately, agreed to delay the dispositional hearing for six months. The court engaged T.R.C. in the following colloquy:
COURT: What [trial counsel] has told me is that you would like to enter a no contest plea to the continuing CHIPS ground that's alleged as one of the potential grounds for termination of your parental rights in this petition. Is that the case today, ma'am?
T.R.C.: Yes.
COURT: Have you had a chance to discuss that decision with [trial counsel]?
T.R.C.: Yes.
COURT: Do you feel like you had enough time to talk to [trial counsel] about your decision?
T.R.C.: Yes.
....
COURT: Do you understand that by entering a no contest plea, you're not admitting that any of these allegations in the petition are true or that any of the allegations that the State will provide some brief testimony about are true. But what you are doing is you're recognizing that the State can prove enough of these allegations to establish that grounds exist to terminate your parental rights under the continuing CHIPS allegations. Do you understand that?
T.R.C.: Yes.
COURT: Do you understand that by entering your no contest plea, you're not agreeing to termination of your parental rights. What we'll do is we'll set this case over for dispositional hearing and at the dispositional hearing I will have the - you'll still have the ability to challenge whether I should in fact terminate your parental rights. Do you understand that?
T.R.C.: Yes.
COURT: Do you understand though that at the dispositional hearing the issues are a bit different. The only focus at that point will be on what is in [D.'s] best interest. The focus - there will not - I will no longer need to decide whether grounds exist to terminate your parental rights or whether the State has proven grounds by clear and convincing evidence. Do you understand that?
T.R.C.: Yes.
COURT: Okay. Do you understand that although you're not agreeing to termination of your parental rights, it's possible that the outcome of this case will be termination of your parental rights. Do you understand that?
T.R.C.: Yes.
COURT: Okay. Do you understand that if I accept your no contest plea and find that grounds exist to terminate your parental rights, that I'll be required by law to make a finding that you're unfit as a parent for [D.] Do you understand that?
T.R.C.: Yes.
COURT: Okay. Do you understand that once we move to the dispositional phase, the decision about what to do next, about whether to terminate your parental rights will be made by me, by the Court alone. Do you understand that?
T.R.C.: Yes.
....
COURT: Do you understand if we establish grounds to terminate your parental rights and make a finding that you're unfit, if we go to dispositional hearing and I make a finding that it's in [D.'s] best interest for me to terminate your parental rights, that that's what I'll do at that hearing. Do you understand that?
T.R.C.: Yes.
....
COURT: Okay. Is there anybody you would like to talk to, a counselor, a relative, your mother, anybody else you would like to talk to before you make your decision today?
T.R.C.: No.
COURT: Okay. So [the guardian ad litem] who is sitting at the back table is the guardian ad litem for [D.] It's his job to represent what is in [D.'s] best interest. Do you understand his role?
T.R.C.: Yes.
COURT: Have you had any discussion with [the guardian ad litem] about entering your no contest plea today?
T.R.C.: No.
COURT: No. Okay. Has anybody at all including your lawyer, me or the guardian ad litem or the State, anybody, offered you anything, offered you gifts or money or to do anything for you other than the agreement to put off disposition in this case for another six months if you come to court and enter your no contest plea today?
T.R.C.: No.
....
COURT: Do you have any questions at all about what you're doing today?
T.R.C.: No.
....
COURT: Okay. Would you like any more time to think about what you are doing or talk to your lawyer about it?
T.R.C.: No.
COURT: Is there anything that you feel like you need to do before entering your no contest plea that you haven't done yet?
T.R.C.: No.
COURT: Okay. Have you discussed with [trial counsel] what kind of - what your strategy would be if you had a trial, what you would argue, what witnesses you would call, what the case would be that you try to make at trial?
T.R.C.: Yes.
COURT: And do you feel like you understand all that?
T.R.C.: Yes.
COURT: Are you satisfied with your lawyer ... and the representation she's given you on this case.
T.R.C.: I am.
COURT: Is there anything about these proceedings that you don't understand, anything you'd like to ask me or your lawyer about before we move forward?
T.R.C.: No.
COURT: Are you making your decision to enter your no contest plea to continuing CHIPS grounds freely, voluntarily, intelligently, with full understanding after having thought about everything we talked about today and after having consulted with your lawyer?
T.R.C.: Yes.
COURT: And understanding all of the rights that you have, all the rights you are giving up today, do you still want to enter your no contest plea to continuing CHIPS grounds?
T.R.C.: Yes, I do.
(Emphasis added.)
¶12 The trial court accepted the plea and the case proceeded to prove-up. D.'s family case manager testified that D. had been in out-of-home care since December 2013 and that there had been "no significant progress to the reunification of her in the home." She testified that T.R.C. had failed to meet several conditions of reunification, that her behavior posed a threat to D.'s safety, and that she would be unable to make the progress necessary for D. to return home. The court found, based on the testimony and the documents from the underlying CHIPS case, that the State had established by clear and convincing evidence that each element of WIS. STAT. § 48.415(2) had been satisfied: that D. had been removed from the home as part of the CHIPS case, that there was a dispositional order entered with the requisite warnings, that reasonable efforts had been made to help T.R.C., that T.R.C. had been unable to meet the conditions for reunification, and that "given the length of time this has been pending and the progress [T.R.C.] has not made during that time, it's substantially unlikely that [T.R.C.] will be able to meet those conditions within the next nine months." The trial court found that grounds existed for termination and, as required by statute, made a finding that T.R.C. was unfit. The matter was then adjourned for a contested dispositional hearing scheduled for six months later.
¶13 The dispositional hearing, scheduled for June, did not ultimately occur until October 2017, ten months after the grounds determination. In the meantime, motion and status hearings were held in May, June, July, and August. During this period, the court learned that T.R.C. had missed a meeting with the family case manager and an important doctor's appointment for D. The court also learned of problems related to the visits. The family case manager reported that D. had twice returned to the foster home after a seven-hour unsupervised visit with T.R.C. wearing the same diaper that she had been dropped off in, and it was soaked through onto her clothes. D. also had repeatedly returned from visits with gastrointestinal symptoms that appeared only after visits with T.R.C. The family case manager then came to supervise feeding times when D. was visiting T.R.C.[5] In August, the case manager reported that a doctor had diagnosed D. with lactose intolerance and had ordered dietary changes as a result.
¶14 At the dispositional hearing, testimony was taken from D.'s foster mother and from the family case manager. The family case manager testified that there were concerns about D.'s gastrointestinal symptoms after visits and there were concerns that D. was being left in the care of others during visitation times. DMCPS implemented two types of services: a "pop-in service" and a "safety control service." In a "pop-in service" a worker made unannounced visits during visitation times. In a "safety control service" a worker came "exactly at the feed time" to "watch that feed and then leave." The case manager testified to the pop-in service and indicated that on two occasions, the supervisor was unable to find T.R.C. She testified that when the safety control was in place, D. would not be sick after visits. She testified that she had been "hopeful" after the diagnosis of lactose intolerance that D.'s post-visit problems "would subside after the dairy was removed from her diet[.]" However, even after that, D. was again sick after a visit where there had been no supervision. She also testified that T.R.C. had not consistently attended therapy and that she had not complied with the random urine screens required by the CHIPS order.
¶15 T.R.C. testified and denied any inappropriate care of D. during visitation. She denied leaving D.'s diaper unchanged. T.R.C.'s mother also testified that she believed T.R.C. could safely parent D.
¶16 In rebuttal testimony, the family case manager answered further questions about the problems at visitation. She testified that the problems D. had with diarrhea occurred "only after her visits" with T.R.C.
¶17 Following the testimony, the trial court specifically noted that it was not considering the time D. had spent in the hospital after her birth: "That stay certainly was not anything [that] to my knowledge resulted from any fault of [T.R.C.] and that is certainly time when although [D.] had to be in the hospital for medical reasons, she was under the care of her mother." The trial court then listed "a few things that struck [the trial court] during this hearing":
I do believe that [D.] has not always received adequate care during her visits with [T.R.C.] I do believe there have been significant stretches of time when [T.R.C.] has not changed [D.'s] diaper or attended to her feeding needs adequately during those visits. I was very struck, again I'll note, by the testimony that [T.R.C.] has avoided interaction with the foster parents and the opportunity to exchange information about [D.] and how she's doing and her feeding needs and her health during those times when they see each other regularly during transportation for visits. I note that [T.R.C.] has not always attended [D.'s] medical appointments....
I also note that I have some concern about the accuracy of the information that I've received from [T.R.C.] And I have some concern while [T.R.C.] has I think stated that she's been working hard to get back on her feet and trying to do what she can for [D.], it's not clear to me that [T.R.C.] has always been forthcoming with this [c]ourt.
After listing specific issues on which "[T.R.C.'s] testimony seems to conflict with a number of different people's testimony[,]" the trial court stated, "I have a concern that the information that I've received from [T.R.C.] ... is not always entirely complete or accurate. And I take that into consideration in weighing the different information that I've heard."
¶18 The trial court then applied the factors of WIS. STAT. § 48.426(3). The court found that: (1) the likelihood of adoption was high; (2) D. is a young child with very significant health challenges that needs a very high level of care; (3) D. had a relationship with T.R.C., but that she would not be harmed if T.R.C.'s parental rights are terminated; (4) D. is too young to articulate her wishes in regard to the case, so that factor did not apply; (5) D. has spent almost two-thirds of her life in out-of-home care; and (6) D. has not always received adequate care during her visits with T.R.C., and an adoptive family could provide D. with the care she needs. The guardian ad litem recommended that T.R.C.'s parental rights be terminated because that was in the best interests of the child. The trial court concluded that termination was in D.'s best interests.
Post-disposition motions.
¶19 T.R.C. appealed. She moved this court for remand, raising arguments based on ineffective assistance of counsel and interest of justice. On remand, the post-disposition court denied the motion without a hearing. The post-disposition court concluded that the motion was "without merit" and "completely ignore[d]" the procedural framework and legal rules governing termination of parental rights cases. It concluded that the testimony about diarrhea was not expert testimony and that the writer of the psychological review did not have testimony relevant to the issues at disposition. For those reasons it concluded that "none of the claims raised in the Post remand motion have merit or require further fact-finding." As to the claim of a constitutional violation, the post-disposition court stated:
The final error claimed in the [p]ost remand motion is that trial counsel failed to argue that the trial court did not use a strict scrutiny analysis to protect [T.R.C.'s] rights under the 14th amendment. In making this argument appellate counsel completely ignores the findings made at the Grounds phase of the proceedings. When the court accepted [T.R.C.'s] no contest plea the court took testimony and found that the State had proven that grounds existed to terminate [T.R.C.'s] parental rights by clear convincing and satisfactory evidence. Based on that finding, the court, as required by law, made a finding that she was unfit as a parent. The [p]ost remand motion references language from the United States Supreme Court in Santosky v. Kramer , 455 U.S. 745, 102 S. Ct. 1388 (1982) and the Wisconsin Supreme Court's holding in Barstad v. Frazier , 118 Wis. 2d 549, 348 Wis. 2d 479 (1984). Neither of these cases offer any support for [T.R.C.'s] position. In Santosky the United States Supreme Court held that a finding of grounds to terminate parental rights required a higher burden of proof than simply the greater weight of the credible evidence. The court required states to prove grounds for termination by at least clear, convincing and satisfactory evidence. The Court did not require that states prove termination grounds beyond a reasonable doubt, noting that a number of factors in termination cases were not amenable to that level of proof.
Proceedings under [ WIS. STAT. §] 48.415 comply with the Court's holding in Santosky and require that the petitioner provide proof at the grounds phase that is clear convincing and satisfactory.
The [p]ost remand motion quotes language from the Barstad decision that discusses the need for a higher standard than the best interests of the child in custody disputes between a parent and a nonparent third party. However, the motion ignores the fact that [T.R.C.] was found unfit as a parent at the conclusion of the grounds phase. The Barstad court expressly noted that once a parent is found to be unfit, the court then must look at the best interests of the child in making a custody determination.
¶20 T.R.C. then filed a second remand motion, which this court granted, this time alleging, on different grounds, that trial counsel was ineffective, and arguing that her no-contest plea was not knowingly, voluntarily, and intelligently entered. The post-disposition court then heard testimony from T.R.C.'s trial counsel, who testified that she explained to T.R.C. prior to her plea the difference between the grounds and the dispositional phase of a TPR proceeding. Trial counsel believed that T.R.C. understood that difference. She further testified that T.R.C. "decided to do the no contest plea because of the offer of additional time and based on her past ability to move to substantial periods of unsupervised visitations with [D.]"
¶21 The trial court then made findings of fact. It stated that it had reviewed the transcript of the plea hearing. It found that T.R.C.'s trial counsel was "more credible" than T.R.C. and that T.R.C. was aware that entering her plea would result in a finding of unfitness. It found that the trial court's plea colloquy correctly stated the law when it stated, "the only focus [at the disposition hearing] will be on what is in [D.'s] best interest." It further found that "the record establishes that when [T.R.C.] entered her no contest plea, she understood that the sole focus would be the best interests of her daughter at the disposition hearing." It therefore concluded that her plea had been entered freely, voluntarily, and intelligently. It noted the trial counsel's testimony that the plea agreement had been a strategic decision by T.R.C. in order to delay the dispositional hearing and to "put [T.R.C.] in a much stronger position at the disposition hearing" by giving her additional time to "build a track record" of successful visitation. It concluded that there was no basis to vacate the order.
¶22 This appeal follows.
DISCUSSION
I. Standard of review.
¶23 This appeal presents review of the trial court's credibility determinations, findings of fact, and conclusions of law.
¶24 "[T]he trial court is the ultimate and final arbiter of the credibility of witnesses, and we must accept the trial court's credibility determination." Nicholas C.L. v. Julie R.L. , 2006 WI App 119, ¶23, 293 Wis. 2d 819, 719 N.W.2d 508. An appellate court will not overrule a trial court's credibility determination absent a finding that it is "inherently or patently incredible," or "in conflict with the uniform course of nature or with fully established or conceded facts." Chapman v. State , 69 Wis. 2d 581, 583, 230 N.W.2d 824 (1975) (footnotes omitted).
¶25 When the trial court acts as finder of fact, it is responsible for making findings on the ultimate facts and separately stating its conclusions of law. WIS. STAT. § 805.17(2). The trial court's findings of fact "shall not be set aside unless clearly erroneous."Id. Such factual findings will be upheld as long as they are supported by any credible evidence or reasonable inferences that can be drawn therefrom. Meyer v. Classified Ins. Corp. , 179 Wis. 2d 386, 396, 507 N.W.2d 149 (Ct. App. 1993). The court will search the record for evidence to support the trial court's findings of fact. Becker v. Zoschke , 76 Wis. 2d 336, 347, 251 N.W.2d 431 (1977). We must accept any reasonable inferences the factfinder makes from the evidence. Cogswell v. Robertshaw Controls Co. , 87 Wis. 2d 243, 250, 274 N.W.2d 647 (1979). Conflicts in the testimony are resolved in favor of the trial court's findings of fact. Norwood v. State , 74 Wis. 2d 343, 364, 246 N.W.2d 801, 812 (1976).
¶26 The trial court's conclusions of law are entitled to no deference and are reviewed de novo. Ball v. District No. 4 Area Bd. of Vocational, Tech., and Adult Educ. , 117 Wis. 2d 529, 537, 345 N.W.2d 389 (1984).
II. Relevant law.
¶27 "[A] parent's desire for and right to the companionship, care, custody, and management of his or her children is an important interest that undeniably warrants deference and, absent a powerful countervailing interest, protection." Lassiter v. Dep't of Soc. Servs. , 452 U.S. 18, 27 (1981) (internal quotations omitted); see also Evelyn C.R. v. Tykila S. , 2001 WI 110, ¶20, 246 Wis. 2d 1, 629 N.W.2d 768. The parent's interest in the parent-child relationship "is recognized as a fundamental liberty interest protected by the Fourteenth Amendment." Steven V. v. Kelley H. , 2004 WI 47, ¶22, 271 Wis. 2d 1, 678 N.W.2d 856 (citing Santosky v. Kramer , 455 U.S. 745, 753 (1982) ). Our supreme court has summarized the law on termination of parental rights in Wisconsin as follows:
Nevertheless, Wisconsin's Children's Code, Wis. Stat. ch. 48, provides that "under certain circumstances" a court "may determine that it is in the best interests of the child for the child to be removed from his or her parents, consistent with any applicable law relating to the rights of parents." Termination of parental rights adjudications are "among the most consequential of judicial acts" because they involve the power of the State to "permanently extinguish[ ]" any legal recognition of the rights and obligations existing between parent and child. "When the State moves to destroy weakened familial bonds, it must provide the parents with fundamentally fair procedures."
Initially, the parental right is considered paramount "until there has been an appropriate judicial proceeding demonstrating that the state's power may be exercised to terminate that right." A court may not terminate parental rights without first making an individualized determination that the parent is unfit. Once an unfitness determination is made, however, it is the best interests of the child rather than the rights of the parent that is considered "paramount." To accommodate the different and sometimes conflicting interests involved, termination of parental rights proceedings are bifurcated into two phases.
The first phase consists of a fact-finding hearing, where the purpose is to determine whether parental unfitness can be proven. During this first phase, the parent receives a full complement of procedural rights. The burden is on the petitioner to demonstrate by clear and convincing evidence that grounds for termination exist. If the petitioner meets that burden, the court must find the parent to be unfit.
An unfitness finding does not predetermine the ultimate outcome of the proceedings. Rather, a finding of unfitness permits the court to move on to the second phase of the proceedings, the dispositional phase. During the dispositional phase, the court determines whether the parent's rights will be terminated and if so, what will happen to the child. It is the best interests of the child that is the "polestar" at the dispositional hearing.
Brown Cty. DHS v. Brenda B. , 2011 WI 6, ¶¶30-33, 331 Wis. 2d 310, 795 N.W.2d 730 (emphasis added, citations omitted). The State has a "compelling interest [in] protecting children from unfit parents, including the temporal component in this interest that promotes children's welfare through stability and permanency in their lives." Dane Cty. DHS v. P.P. , 2005 WI 32, ¶32, 279 Wis. 2d 169, 694 N.W.2d 344.
¶28 As relevant to this case, WIS. STAT. § 48.415(2) provides that grounds for termination of parental rights can be established by showing that a child is in "[c]ontinuing need of protection or services." To establish this, the State must prove the following:
1. That the child has been adjudged to be a child ... in need of protection or services and placed ... outside his or her home pursuant to one or more court orders ... containing the [required] notice[.]
2. a. In this subdivision, "reasonable effort" means an earnest and conscientious effort to take good faith steps to provide the services ordered by the court which takes into consideration the characteristics of the parent or child or of the expectant mother or child, the level of cooperation of the parent or expectant mother and other relevant circumstances of the case.
b. That the agency responsible for the care of the child and the family or of the unborn child and expectant mother has made a reasonable effort to provide the services ordered by the court.
3. That the child has been placed outside the home for a cumulative total period of 6 months or longer pursuant to an order listed under subd. 1. ... that the parent has failed to meet the conditions established for the safe return of the child to the home; and, if the child has been placed outside the home for less than 15 of the most recent 22 months, that there is a substantial likelihood that the parent will not meet these conditions as of the date on which the child will have been placed outside the home for 15 of the most recent 22 months ....
Sec. 48.415(2)(a)1.-3. (emphasis added).
III. T.R.C. has not made a prima facie case that the plea colloquy was deficient.
¶29 "[I]t is during the first phase of an involuntary termination of parental rights proceeding that the parent's interest in the parent-child relationship is most jealously protected." Brenda B. , 331 Wis. 2d 310, ¶34. A parent who chooses to enter a no contest plea during this phase is giving up valuable protections and must have knowledge of the rights being waived by making the plea. Kenosha Cty. DHS v. Jodie W. , 2006 WI 93, ¶25, 293 Wis. 2d 530, 716 N.W.2d 845 (citing State v. Bangert , 131 Wis. 2d 246, 265-66, 389 N.W.2d 12 (1986) ). The principles and analysis of Bangert apply. Jodie W. , 293 Wis. 2d 530, ¶24. The trial court must engage the parent in a colloquy to ensure that the plea is knowing, voluntary, and intelligent. Id. This colloquy is governed by the requirements of WIS. STAT. § 48.422(7) and notions of due process. Waukesha Cty. v. Steven H. , 2000 WI 28, ¶¶25, 39, 233 Wis. 2d 344, 607 N.W.2d 607.
¶30 To make a prima facie case that the plea was not knowing, voluntary, and intelligent, a parent must show that the colloquy was deficient and also allege that he or she did not know or understand the information that should have been provided. Id. , ¶42. At that point, the burden shifts to the petitioner to demonstrate by clear and convincing evidence that the parent knowingly, voluntarily, and intelligently pled no contest. Id.
¶31 T.R.C. argues that the trial court "minimized the significance of the no contest plea" when it characterized the dispositional hearing issues as "a bit different" than the issues at the grounds phase. The trial court's exchange with T.R.C. on this point was as follows:
COURT: Do you understand that by entering your no contest plea, you're not agreeing to termination of your parental rights. What we'll do is we'll set this case over for dispositional hearing and at the dispositional hearing I will have the - you'll still have the ability to challenge whether I should in fact terminate your parental rights. Do you understand that?
T.R.C.: Yes.
COURT: Do you understand though that at the dispositional hearing the issues are a bit different. The only focus at that point will be on what is in [D.'s] best interest. The focus - there will not - I will no longer need to decide whether grounds exist to terminate your parental rights or whether the State has proven grounds by clear and convincing evidence. Do you understand that?
T.R.C.: Yes.
(Emphasis added.) T.R.C. argues that trial counsel "did not object when the court said 'a bit different' and did not correct the judge[.]" T.R.C. argues conclusorily that the difference in the burden of proof at the grounds phase and the disposition phase is not "a bit different" but is rather "hugely and drastically different."
¶32 T.R.C.'s argument is based on three words taken out of context. The plea colloquy, as fully reproduced above, states the law correctly and fully. We conclude that the trial court did not fail in its mandatory duties in the plea colloquy. Because that is the threshold question in a plea colloquy analysis, we need not address T.R.C.'s arguments that trial counsel performed deficiently in explaining the consequences of the plea and that she did not understand that she was giving up her right to contest her parental fitness. We note that T.R.C. told the trial court in the plea hearing that she did understand that she was giving up those rights and that following the post-remand hearing the trial court found trial counsel's testimony credible when she testified that she had explained the strategy and the plea consequences to T.R.C.
IV. Trial counsel did not render constitutionally ineffective assistance of counsel.
¶33 Parents in involuntary termination of parental rights cases have a statutory right to counsel as provided in WIS. STAT. § 48.23(2), and included is the right to effective counsel. A.S. v. State , 168 Wis. 2d 995, 1004-5, 485 N.W.2d 52 (1992). To prove ineffective assistance of counsel, a party must show both that trial counsel performed deficiently and that the deficiency resulted in prejudice. State v. Love , 2005 WI 116, ¶30, 284 Wis. 2d 111, 700 N.W.2d 62. To establish deficient performance, T.R.C. must point to specific acts or omissions that are "outside the wide range of professionally competent assistance." See Strickland v. Washington , 466 U.S. 668, 690 (1984). She must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." See id. at 669. The defendant's burden is to show that counsel's errors "actually had an adverse effect on the defense." State v. Franklin , 2001 WI 104, ¶14, 245 Wis. 2d 582, 629 N.W.2d 289 (citing to Strickland , 466 U.S. at 687, 693, and 694 ).
¶34 T.R.C. argues that her trial counsel failed at the dispositional hearing in several ways. We address each argument in turn.
A. Failure to object to admissible testimony is not deficient performance.
¶35 T.R.C. argues that trial counsel rendered ineffective assistance by failing to object that the family case manager was not a medical expert and therefore was not competent to testify that D. had been sick after visits with T.R.C. She argues that the family case manager "is not able to provide any scientific knowledge to help determine or resolve any medical allegation issues[.]" The transcript reflects that the family case manager testified that D. suffered from diarrhea "only after her visits" with T.R.C., that the symptoms did not occur when the feedings were supervised at visits, and that even after the diagnosis of lactose intolerance, which she thought might have explained the earlier episodes, the issue continued when there was not supervision at the visits.
¶36 Testimony of an observation of diarrhea does not require a medical expert. Here, the testimony was simple observations of facts that any lay person would know. And we agree with the trial court's conclusion that if this testimony "is in fact opinion testimony, and not simply testimony of factual observations made by the foster parent and the family case manager, it is admissible as lay opinion testimony." See WIS. STAT. § 907.01 (lay witness opinion testimony admissible if it is "not based on scientific, technical, or other specialized knowledge"). The trial court also noted that under WIS. STAT. § 48.299(4)(b), the rules of evidence do not apply at disposition hearings. Because it does not require scientific, technical, or other specialized knowledge to report on observations that D. suffered from diarrhea after visits with T.R.C., this testimony is not inadmissible, and trial counsel did not perform deficiently in failing to object to it. See State v. Allen , 2017 WI 7, ¶46, 373 Wis. 2d 98, 890 N.W.2d 245 ("It is well-established that trial counsel could not have been ineffective for failing to make meritless arguments.").
B. Failure to present irrelevant witnesses is not deficient performance.
¶37 T.R.C. argues that trial counsel performed deficiently by failing to present two witnesses on her behalf at the disposition. She argues that trial counsel should have called one of D.'s pediatric gastroenterologists, whose testimony "would have resolved [the family case manager's] unproven medical neglect allegations" in her favor and "would have been highly favorable to [T.R.C.]" T.R.C.'s argument is based on speculation. Further, as the trial court noted, "the State did not rely on a medical diagnosis, but rather on the fact that loose stools occurred regularly after visits and on virtually no other occasions." T.R.C. has not shown that trial counsel performed deficiently by failing to call this witness.
¶38 T.R.C. also argues that trial counsel should have presented the testimony of the doctor who performed a psychological evaluation of her prior to disposition. The doctor's report stated that T.R.C. "appears to have come a long way in her mental health and lifestyle from when she was younger" and made the following observations:
[T.R.C.] has moved on from many of the negative influences in her life and is living a positive, faith-based life that involves gainful employment, avoidance of drugs and alcohol, making positive behavior choices, positive social support, and the use of emotional coping skills for stress.
T.R.C. argues that this doctor "favored preserving this mother/child relationship, not severing it." However, that argument is not supported by the record. The report pointedly makes no recommendation regarding the termination of parental rights in this case. It states only: "The results of this evaluation also support continuing visitation between [T.R.C.] and her daughter as it is determined to be appropriate by her case management team " (emphasis added). The report recommended that T.R.C. continue urine screenings, therapy, and substance abuse treatment. Most importantly, the report stated that "any concerns regarding [T.R.C.'s] parenting decisions should be addressed directly between [T.R.C.] and her CPS treatment team with the goal of developing an effective plan to remediate the concerns." Finally, and most importantly, the report takes no position on the question presented at the dispositional hearing, which was whether the termination was in D.'s best interest. Therefore, it was not deficient performance for trial counsel not to call this doctor as a witness.
C. T.R.C. waived constitutional arguments when she entered her plea.
¶39 T.R.C. argues that trial counsel was ineffective because she failed to argue that WIS. STAT. § 48.415(2) is unconstitutional as applied to T.R.C. She argues that it violates her constitutional due process rights because where grounds are found based on continuing need of protection and services, that results in terminations of parental rights "for reasons other than parental unfitness[.]" She further argues that her due process rights were violated because there were less restrictive means to protect D. than termination of parental rights and adoption because in her post-remand motion she presented her own affidavit listing three relatives who could care for D. and an affidavit of her twenty-two-year-old brother stating his willingness "to adopt her, if needed."
¶40 The threshold question is whether T.R.C. waived her right to challenge the constitutionality of the statute as applied to her when she entered a plea of no contest. See Jodie W. , 293 Wis. 2d 530, ¶21. A plea of no contest waives all non-jurisdictional defects in the proceedings. State v. Princess Cinema of Milwaukee, Inc. , 96 Wis. 2d 646, 651, 292 N.W.2d 807 (1980). An "as applied" challenge to the constitutionality of a statute is a non-jurisdictional defect. State v. Cole , 2003 WI 112, ¶46, 264 Wis. 2d 520, 665 N.W.2d 328. When a court is faced with this threshold question, it begins its analysis "by determining whether [the] no contest plea was voluntarily, knowingly, and intelligently entered." See Jodie W. , 293 Wis. 2d 530, ¶24. Waiver is found only after a court has determined that a no contest plea is knowing, voluntary, and intelligent. See id. , ¶38 (where evidence is insufficient to support a determination that a plea is knowing, voluntary, and intelligent, as-applied constitutional challenges are not waived). As explained above, this court determined that T.R.C.'s no contest plea was knowingly, voluntarily, and intelligently entered. Therefore, she has waived her right to challenge the constitutionality of the statute. See id.
D. T.R.C. waived the right to contest the grounds when she entered her plea.
¶41 Finally, T.R.C. argues that trial counsel was ineffective because she failed to argue that the State had failed to "prove up the medical neglect claims" and "did not have a medical expert testify that the medical neglect claims, used as the core argument for TPR, were true." At the grounds phase, however, when T.R.C. entered a no contest plea, the trial court asked her, "But what you are doing is you're recognizing that the State can prove enough of these allegations to establish that grounds exist to terminate your parental rights under the continuing CHIPS allegations. Do you understand that?" And T.R.C. answered, "Yes." Because the colloquy establishes that the no contest plea was validly entered, T.R.C. waived her right to challenge the finding of unfitness. See Steven H. , 233 Wis. 2d 344, ¶49 (holding that "where [i]t is clear from the colloquy that [the respondent] understood the nature of the acts alleged in the petition and the potential disposition," a no contest plea waives "the right to contest the fact-finding hearing").
V. A new trial in the interest of justice is not warranted.
¶42 T.R.C. argues that we should act pursuant to WIS. STAT. § 752.35 and reverse the trial court's order. This court may reverse the order appealed from "if it appears from the record that the real controversy has not been fully tried, or that it is probable that justice has for any reason miscarried," and in such cases, we may remand for a new trial "as ... necessary to accomplish the ends of justice." Id. "The power to grant a new trial when it appears the real controversy has not been fully tried 'is formidable, and should be exercised sparingly and with great caution.' " State v. Sugden , 2010 WI App 166, ¶37, 330 Wis. 2d 628, 795 N.W.2d 456 (citation omitted). We exercise our power to grant a discretionary reversal only in exceptional cases. Id.
¶43 T.R.C. argues that because the guardian ad litem who recommended termination of parental rights at the disposition hearing was later subject to a criminal investigation for child pornography in a separate matter, there was a conflict of interest that "tainted" the order in this case, and it must be vacated. The post-remand court found that T.R.C. had established no nexus whatsoever between the hearings in this case and the investigation in the other matter. It therefore refused to hear evidence on the grounds that it was not relevant to this proceeding. We agree. T.R.C.'s argument is based on merely conclusory and speculative allegations.
¶44 Finally, T.R.C. argues that the interest of justice requires this court to reunite D. with T.R.C.; however, she presents no developed argument in support of her position other than to assert that "there are no compelling reasons to terminate [the] relationship." She does not advance an actual argument supporting her request. Under these circumstances and on this record, we decline to exercise our WIS. STAT. § 752.35 discretionary reversal power.
By the Court. -Order affirmed.
This opinion will not be published. See WIS. STAT. RULE 809.23(1)(b)4.

This appeal is decided by one judge pursuant to Wis. Stat. § 752.31(2)(e) (2017-18). All references to the Wisconsin Statutes are to the 2017-18 version unless otherwise noted.
Notwithstanding Wis. Stat. § 809.107(6)(e), we may extend the time to issue a decision in termination of parental rights cases. See Rhonda R.D. v. Franklin R.D., 191 Wis. 2d 680, 694, 530 N.W.2d 34 (Ct. App. 1995). Due to the need to address the number of issues raised by the parties on appeal, on our own motion, we extend the decisional deadline in this appeal to the date of this decision.

T.R.C. also argues that at the grounds phase trial counsel rendered ineffective assistance of counsel by failing to explain to her the consequences of pleading no contest.

The petition also alleged grounds of failure to assume parental responsibility; at the grounds hearing, the State dismissed the failure to assume charge. D.'s father voluntarily terminated his parental rights.

During the pendency of D.'s CHIPS and TPR cases, the Bureau of Milwaukee Child Welfare (BMCW) was renamed the Division of Milwaukee Child Protective Services (DMCPS). We refer to the agency as DMCPS throughout.

D. "has a G-tube and breathing issues" and she "requires medication in the morning and gets four and a half feedings per day." At the time of the termination proceedings, D. was still in diapers, and "[d]ue to her feeding issues she needed to have her diapers changed every three hours."